In the United States District Court
for the District of South Carolina
Florence Division

| | |
|---|---|
| Chris Gagliastre, *et al.*,<br><br>*On behalf of themselves and those similarly situated*,<br><br>Plaintiffs,<br><br>v.<br><br>Capt. George's Seafood Restaurants, LP, *et al.*,<br><br>Defendants. | Civil Action No. 4:17-cv-1308 (RBH) |

Memorandum of Law in Support of
Plaintiffs' Motion to Conditionally Certify an FLSA Collective Action and to Authorize Notice

### 1. Introduction / Nature of the Case

Plaintiffs Chris Gagliastre, Zachary Tarry, and Olga Zayneeva filed this action to recover unpaid minimum wages, unpaid overtime wages, and unlawfully deducted tips for themselves and similarly situated servers who worked at any of the four Captain George's Seafood Restaurants owned and controlled by Defendants. Plaintiffs allege, among other things, that Defendants (1) unlawfully paid Plaintiffs and their similarly situated co-workers $2.125 per hour (*i.e.*, less than tipped minimum wage), (2) unlawfully required Plaintiffs and similarly situated servers to share tips with the "house," and (3) unlawfully paid Plaintiffs and similarly situated servers at the wrong overtime rate. Through this motion, Plaintiffs seek to take the first step in protecting the rights of their fellow servers: sending them Court-approved notice of this action

1

and letting the workers decide whether to seek unpaid wages under the Fair Labor Standards Act ("FLSA").

Plaintiffs exceed the "modest factual showing" required to prevail on this motion. *Morris v. Barefoot Communications, Inc.,* No. 4:15-cv-1115, 2017 WL 698612, *2 (D.S.C. Feb. 22, 2017) (Harwell, J). Through the Complaint's allegations, Plaintiffs' declarations, Plaintiffs' paystubs and tip-related documents, and Defendants' representations to the public, Plaintiffs show that the proposed Collective members are similarly-situated to Plaintiffs. Accordingly, conditional collective action certification is appropriate, and the Court should authorize notice pursuant to 29 U.S.C. § 216(b).

## 2. Factual and Legal Background of the Claims at Issue

### 2.1. The Parties

The proposed FLSA collective class ("the Collective") consists of all servers or similar employees who worked at the four Captain George's Seafood Restaurants from May 31, 2014 to present. "Captain George's Seafood Restaurant is one of the largest privately owned restaurant companies in the country." *See* Ex. A, Captain George's Facebook Page, "About."

Plaintiffs are each representative members of the Collective because they worked as servers at Defendants' Captain George's Seafood Restaurant in Myrtle Beach, South Carolina and were subject to each of the wage and hour violations alleged herein.[1] *See generally*, Ex. B, Declaration of Chris Gagliastre ("Gagliastre Decl."); Ex. C, Declaration of Zachary Tarry ("Tarry Decl."); Ex. D, Declaration of Olga Zayneeva ("Zayneeva Decl."). All of Plaintiffs' paystubs for

---

[1] Chris Gagliestre worked as server from March 2015 to August 2015. *See* Ex. B, ¶ 2. Zachary Tarry worked as a server from August 2014 to May 2015, and then worked as an assistant manager until June 2016. *See* Ex. C, ¶ 2. Olga Zayneeva has worked as a server from August 2014 to present. *See* Ex. D, ¶ 2.

work completed at Captain George's were issued by Captain George's Seafood Restaurants, LP. *See* Ex. E, Gagliastre Paystub; Ex. F, Tarry Server Paystubs; Ex. G, Zayneeva Paystubs.

George and Sherry Pitsilides started Captain George's in 1979, when they converted their Hampton House restaurant into the original Captain George's Seafood Restaurant. *See* Ex. H, Second Amended Verified Complaint, *Pitsilides v. Lideslambous, Inc., et al*, 2:14-cv-137 (E.D. Va. May 9, 2014) (beginning on Page ID 288). In 1982, the Pitsilideses opened the Captain George's location on Laskin Road in Virginia Beach, Virginia, the location from which they still run their entire enterprise. *Id*.; Ex. I, Excerpts from website, "Contact the Captain" page. Thereafter, the Pitsilideses opened the Williamsburg, Virginia location in 1985, the Myrtle Beach, South Carolina location in 2000, and the Outer Banks, North Carolina location in 2008. *See* Ex. H at Page ID 289. The four restaurants employ 400 people during the offseason and nearly 800 people during tourist season. *See* Ex. J, "Captain George's Seafood Restaurant," U.S. Business Executive Magazine (hereinafter, "U.S. Business Executive Article 1").

George Pitsilides is the founder and Chief Executive Officer of Captain George's Seafood Restaurants. *See* Ex. J, U.S. Business Executive Article 1; Ex. K, George Pitsilides LinkedIn Profile; Ex. L, Sampling of Corporate filings for various entity Defendants. As George explained in 2016, "I'm a hands-on owner who oversees operations in all four of my restaurants. I have developed a great working relationship with the staff and my management teams at each location." *See* Ex. J, U.S. Business Executive Magazine Article 1. George credits the restaurant's success to the team approach he and his wife Sherry employ, and the way they handle everyday operations of the restaurants together. *Id*. Sherry and George's daughters, Kristina Chastain and Nicole Perkins, are also centrally involved in operating the Captain George's Seafood Restaurants. As Chastain has explained, she and Perkins are "co-presidents, she (Perkins)

3

handles the financial aspect, and I'm more on the operational end of things." *See* Ex. M, "Captain George's Seafood Restaurant," U.S. Business Executive Magazine (the "U.S. Business Executive Article 2").

The Pitsilideses operate the Captain George's Seafood Restaurants through a variety of legal entities headquartered at 1956 Laskin Road in Virginia Beach, Virginia, which is the location of the Virginia Beach Captain George's Seafood Restaurant. *See* Ex. I, Excerpts from website, "Contact the Captain" page. Those legal entities include Capt. George's Seafood Restaurants, LP; Captain George's of South Carolina, LP; Captain George's of South Carolina, Inc.; The Captain at the Beach, LLC; Captain KDH, LLC; PitCo 1, LLC; PitNorth, LLC; Lideslambous, Inc.; and Pitsilambous, Inc. *See* Ex. L, Sampling of Corporate filings for entity Defendants (listing George as president or manager of each entity, and listing Chastain and/or Perkins in executive roles in Lideslambous, Pitsilambous, Captain George's of South Carolina, LP, Captain George's of South Carolina, Inc., Captain KDH, and the Captain at the Beach).

### 2.2. Defendants' compensation policies and practices violate the FLSA.

Throughout Plaintiffs' employment, Defendants have violated servers' wage rights in a number of ways. For purposes of this motion, Defendants apply three policies to Plaintiffs and similarly situated servers that violate the FLSA. First, Defendants pay servers $2.125 per hour, which is *less than* tipped minimum wage. Second, Defendants require servers to make tip-out payments directly to the restaurant itself, and to other workers who were not customarily and regularly engaged in customer service. Third, servers are paid for their overtime hours at the wrong rate. For each of these reasons, conditional certification of a collective action is appropriate.

#### 2.2.1. Defendants have failed to pay tip credit minimum wage.

Although an employer must generally pay its employees regular minimum wage, federal wage and hour law provides an exception for "tipped employees." *See* 29 U.S.C. 203(m). Under this exception in the FLSA, an employer may claim a "tip credit" in lieu of paying its employees the full minimum wage. To do so, the employer must meet certain requirements. First, the employer must actually pay tip credit minimum wages. 29 U.S.C. 203(m). Second, the employer must inform the employees of the employer's intent to take the tip credit. *Id.* Third, the employee must be allowed to keep all of their tips, subject to very specific exceptions relating to tip pooling. *Id.*

Under the FLSA, tipped employee minimum wage is $2.13 per hour, meaning the maximum permissible tip credit an employer may take is currently $5.12 per hour. *See* 29 U.S.C. § 203(m); 29 C.F.R. § 531.50(a) (explaining that tipped employees must be paid at least $2.13 per hour, the tipped minimum wage rate set on August 20, 1996). Here, Defendants have taken a tip credit of $5.125 per hour from their servers' wages. Accordingly, Plaintiffs and the rest of Captain George's servers are not paid tip credit minimum wage, but are instead paid $2.125 for each hour worked as their regular pay rate. *See* Exs. E, F, & G (paystubs showing Plaintiffs were paid $2.125 per hour). Thus, Defendants have not met the requirements to pay tipped minimum wage. While a half cent per hour difference may seem small, compliance with the law (*i.e.*, paying an additional half cent) is not difficult, and the FLSA's requirements are absolute. *See, e.g., Reich v. Chez Robert, Inc.*, 28 F.3d 401, 404 (3rd Cir. 1994) (agreeing with the First Circuit that, with respect to the notice requirement, "If the penalty for omitting notice appears harsh, it is also true that notice is not difficult for the employer to provide." (quoting *Martin v. Tango's Restaurant, Inc.*, 969 F.2d 1319, 1322 (1st Cir. 1992)).

### 2.2.2. In any event, Defendants have failed to meet the requirements for taking a tip credit under the FLSA.

Even if Defendants did pay Plaintiffs and similarly situated servers the proper tipped minimum wage rate, they would still not be permitted to take a tip credit because they require servers to take part in an illegal tip pool. While the FLSA does allow employers to create tip pools, if the tip pool includes non-tipped workers, such as managers, back of the house employees, or the restaurant itself, the tip pool is invalid. *See* 29 U.S.C. 203(m) (noting that "this subsection shall not be construed to prohibit pooling of tips among employees who customarily and regularly receive tips"); *see also, e.g., Gionfriddo v. Jason Zink, LLC*, 769 F. Supp. 2d 880, 893-94 (D. Md. 2011) ("Every court that has considered the issue has unequivocally held that the FLSA expressly prohibits employers from participating in employee tip pools."). An employer who requires tipped workers to take part in an invalid tip pool is not allowed to take a tip credit from their wages. *Id*.

Here, Defendants violated the FLSA's tip pool rules by requiring servers to "tip out" the house, *i.e.*, the restaurant itself. At the end of each night, servers were required to give either 2% or 3% of their sales, in tips, to the restaurant itself. *See* Ex. B, Gagliastre Decl., ¶¶ 10-13; Ex. C, Tarry Decl., ¶¶ 7-14; Ex. D, Zayneeva Decl., ¶¶ 6-13. For example, on the close-out receipt from May 9, 2017, during which Ms. Zayneeva worked in the "Star Up" dining room,[2] she and her fellow servers generated $2,078.67 in total sales and taxes. *See* Ex. N, May 9, 2017 Close-Out Receipt. Based on these sales, Ms. Zayneeva and her fellow server, Sasha, earned $201.98 in tips. *Id*. From those tips, Defendants deducted a "House Tip Out" of 3% of total sales and taxes from the servers' tips, in the amount of $62.36. *Id*. This same scheme was used restaurant-wide.

---

[2] Captain George's restaurants are large buildings with multiple dining rooms. Servers at Captain George's are assigned to a specific dining room for each shift.

*See* Ex. O, September 5, 2016 Restaurant-Wide Close-Out Receipt (showing the "house tip out" being applied to the total sales and taxes for the restaurant on a given night).

The restaurant then uses some of the servers' tips to cover other of Defendants' obligations, such as paying the hourly wages of dishwashers, bussers, runners, cashiers, hostesses, and some back of the house workers. *See* Ex. B, Gagliastre Decl., ¶¶ 10-13; Ex. C, Tarry Decl., ¶¶ 7-14; Ex. D, Zayneeva Decl., ¶¶ 6-13. A different portion of the servers' tips are used to tip out managers and assistant managers. *See* Ex. C, Tarry Decl., ¶ 13. Mr. Tarry, who worked as an assistant manager for Defendants after working as a server, regularly collected tips from servers himself. *See* Ex. C, Tarry Decl., ¶ 12. After collecting the tips, 1.75% of the tip-outs would be put in an envelope and placed in the restaurant's safe, sometimes by Mr. Tarry himself. *Id*.

Under the FLSA, employers are not tipped employees and, accordingly, may not share in employee tip pools. Courts in this district routinely grant conditional certification to servers alleging tip pool violations nearly identical to those alleged here. *See, e.g., Carbone v. Zen 333 Inc.*, No. 2:16-cv-108, 2016 WL 7383920, *8-9 (D.S.C. Dec. 21, 2016) (granting conditional certification to servers who were forced to share tips with the house); *Lynch v. Dining Concepts Group, LLC*, No. 2:15-cv-580, 2015 WL 5916212, **4-5 (D.S.C. Oct. 8, 2015) (granting conditional certification to servers and bartenders who were forced to share tips with the house, which used the tips to pay wages to other employees); *McCoy v. RP, Inc.*, No. 2:14-cv-3171, 2015 WL 6157306, **3-4 (D.S.C. Oct. 19, 2015) (granting conditional certification to servers at Kickin' Chicken who were forced to share tips with non-tipped workers).

### 2.2.3. Defendants do not properly pay servers for overtime work.

Under the FLSA, employers are required to pay each employee one-and-a-half times that employee's regular rate for hours worked in excess of forty per workweek. *See* 29 U.S.C. 207. For a tipped employee (like the members of the putative class), his or her "regular rate" includes "the amount of the tip credit taken by the employer per hour" and "the cash wages paid by the employer." 29 C.F.R. 531.60. Put plainly, a tipped employee's "regular rate" is whatever the full minimum wage is.

Thus, an employee's overtime rate is 1.5 times full minimum wage, as opposed to 1.5 times tipped minimum wage. Employers are permitted to then take the $5.12 per hour tip credit from a tipped employee's wages *after* they have calculated their overtime rate. As a result, the minimum overtime rate for tipped employees under the FLSA is $5.76. *See, e.g., Ventura v. Bebo Foods, Inc.*, 738 F.Supp.2d 8, n. 1 (D.D.C. Dec. 3, 2010); *Copantitla v. Fiskardo Estiatorio, Inc.*, 788 F.Supp.2d 253, 291 (S.D.N.Y. May 27, 2011). Here, Defendants have failed to properly pay servers for their overtime hours. *See* Ex. F, Tarry Paystubs, March 28, 2015 (indicating Tarry was paid $3.18 per hour for overtime hours in 2015); Ex. G, Zayneeva Paystubs, June 4, July 16, and July 30, 2016 (indicating that Zayneeva was paid $4.71 for overtime hours in 2016). As a result, Defendants consistently underpaid Defendants' employees for overtime hours.

**2.3. Defendants subjected all servers to uniform compensation policies and practices.**

Defendants apply the same pay policies, practices, and procedures to all servers at the Captain George's Seafood Restaurants. The Pitsilideses operate each of the Defendants companies out of their headquarters at 1956 Laskin Road in Virginia Beach. *See* Exs. A, H, I, J, L & M. Defendants' representations to the public also make clear that the four Captain George's locations are run as a single enterprise. *Id*. On the home page of their website, Defendants invite guests to, "Come join us for a feast fit for a captain at any of our 4 locations." *See* Ex. I.

George describes himself as a "hands-on owner who oversees operations in all four of my restaurants." *See* Ex. J. He has "developed a great working relationship with the staff and my management teams at each location." *Id*. However, he also leans heavily on his wife and two daughters. Chastain handles restaurant operations, and Perkins handles the restaurants' finances. *See* Ex. M.

All of the Plaintiffs received or receive paystubs for the work they complete for Defendants from "Capt. George's Seafood Restaurant**s**, LP." *See* Exs. B, C, & D. Ms. Zayneeva has worked with two employees, Taylor Long and Haley Whittaker, who have worked at both the Myrtle Beach and Virginia Beach Captain George's locations. *See* Ex. D, Zayneeva Decl., ¶ 21. Ms. Whittaker informed Ms. Zayneeva that servers have to pay house tip outs at the Virginia Beach location in a similar manner that they are required to pay house tip outs at the Myrtle Beach location. *Id*. Finally, upon hire, Plaintiff Gagliastre was required to take a test regarding Captain George's operations, which required employees to know about restaurant operations, locations, and history. *See* Ex. B, Gagliastre Decl., ¶ 22.

### 3. Law & Argument

#### 3.1. Legal Standard for Conditional Collective Action Certification.

The FLSA empowers Plaintiffs to maintain an action for unpaid wages on behalf of themselves and "similarly situated employees." 29 U.S.C. 216(b). Before a similarly situated employee may become a party plaintiff to this lawsuit for purposes of their FLSA claims, he or she must file a written consent with the Court. *Id.* This distinct "opt-in" structure heightens the need for employees to "receiv[e] accurate and timely notice concerning the pendency of the collective action." *Hoffman-La Roche Inc. v. Sperling,* 493 U.S. 165, 170 (1989). The statute

therefore vests district courts with "discretion to implement 29 U.S.C. § 216(b) … by facilitating notice to potential plaintiffs." *Id.* at 169.

District courts employ a two-step process in analyzing the certification of a collective action under the FLSA. At the first step, the court generally considers "whether other similarly situated employees should be notified." *Morris*, 2017 WL 698612, *2 (citing *Curtis v. Time Warner Enter.-Advance Newhouse Partnership*, No. 3:12-CV-2370, 2013 WL 1874848, at *2 (D.S.C. May 3, 2013)). The second step is triggered by an employer's motion for decertification and typically occurs after substantial discovery has taken place. *Id*.

Plaintiffs' Motion deals with the first stage. Under step one, courts often require a plaintiff show a "reasonable basis" for his or her claim that there are other similarly situated employees. *Id.* (citations omitted). Alternatively, courts have required plaintiffs to "make a 'modest factual showing' that they and potential opt-in plaintiffs 'together were victims of a common policy or plan that violated the law.'" *Id.* (quoting *Myers v. Hertz Corp.*, 624 F.3d 537, 554-55 (2d Cir. 2010)). Under this step, the plaintiff's burden has been described as "fairly lenient," or a "low standard of proof," because the court is simply trying to determine whether "similarly situated" plaintiffs exist. *Id.; Curtis,* 2013 WL 1874848, *2.

Courts in the Fourth Circuit have made clear that conditional certification of an FLSA collective action is evaluated at a far more lenient standard than Rule 23 class actions. "Because of the special policy considerations that the FLSA comprehends, Rule 23 standards are generally inapplicable to FLSA collective actions." *Butler v. DirectSAT USA, LLC*, 876 F.Supp.2d 560, n. 9 (D. Md. Apr. 10, 2012) (quoting *Essame v. SSC Laurel Operating Co. LLC*, 847 F.Supp.2d 821, 828 (D. Md. Mar. 12, 2012).

Further, because no discovery has yet taken place, the Court must apply the "lenient standard," and should not apply an "intermediate" standard to Plaintiffs' conditional certification motion. In some cases, "where the parties have already engaged in substantial discovery," some district courts have "utilized a somewhat heightened amount of scrutiny when reviewing the plaintiffs' [conditional certification] motion." *Curtis*, 2013 WL 1874848, *3 (citations omitted) (applying the lenient standard even where the parties had engaged in discovery); *see also Houston v. URS Corp.*, 591 F.Supp.2d 827, 831 (E.D. Va. 2008) (holding that because "the statute of limitations continues to run on unnamed class members' claims until they opt into the collective action…courts have concluded that the objectives to be served through a collective action justify the conditional certification of a class of putative plaintiffs early in a proceeding, typically before any significant discovery, upon an initial showing that the members of the class are similarly situated."). Here, the "lenient standard" for conditionally certifying an FLSA Collective applies.

### 3.2. Plaintiffs are similarly situated to the putative Collective.

Plaintiffs seek to represent the following Collective action class, the members of which have been harmed by Defendants' unlawful pay policies and practices:

> All non-owner, non-employer servers or similar employees who worked for Defendants at the Captain George's Seafood Restaurants from May 31, 2014 to present.

Defendants applied the same policies to all of its servers: (1) they pay servers $2.125 per hour, (2) they require servers to share their tips with the restaurant and others who are not permitted to be included in the tip pool, and (3) they pay servers the wrong rate for their overtime hours.

Plaintiffs have easily made a modest factual showing that they and other servers at Captain George's were together victims of a common policy or plan that violated the law, and/or

that they have a reasonable basis for their claim that they and others are similarly situated. *Morris*, 2017 WL 698612, *2. Each named Plaintiff was subject to the unlawful pay policies described above (*i.e.*, each was paid $2.125 per hour by "Capt. George's Seafood Restaurants, LP,"[3] each was required to pay directly to the house a portion of their tips that was determined by reference to the total sales they completed on their shift,[4] and Plaintiffs Zayneeva and Tarry each have worked overtime hours for which they were not paid at the proper rate[5]). These pay policies were obviously not particular to the three named Plaintiffs.

For example, each named Plaintiff has had conversations with other workers who were also required to pay a portion of their tips directly to the house. *See* Ex. B, Gagliastre Decl., ¶ 25; Ex. C, Tarry Decl., ¶ 15; Ex. D, Zayneeva Decl., ¶ 13. Ms. Zayneeva has spoken to an employee who worked at the Virginia Beach Captain George's location, who explained that she also has to tip out the house. *See* Ex. D, Zayneeva Decl., ¶ 21.

Further, Plaintiffs' employment documents show that other employees were subjected to the same policies applied to Plaintiffs. Ms. Zayneeva's close-out receipt and related documents from May 9, 2017 make clear that at least one other person—"Sasha"—worked alongside Ms. Zayneeva in the Star Up dining room and had to pool tips just as she did. *See* Ex. N, May 9, 2017 Close-Out Receipt; Ex. D, Zayneeva Decl., ¶ 13. Mr. Tarry also worked as an assistant manager, so he has firsthand knowledge of not only his own tip outs, but of all server tip outs. *See* Ex. O, Sept. 5, 2016 Restaurant-Wide Close-Out Receipt; Ex. C, Tarry Decl., ¶¶ 11-15. He was responsible for overseeing the house tip out policy at the end of each night during which he

---

[3] *See, e.g.*, Exs. E, F, & G, Plaintiffs' Paystubs.
[4] *See* Ex. B, Gagliastre Decl., ¶¶ 9-13; Ex. C, Tarry Decl., ¶¶ 7-13; Ex. D, Zayneeva Decl., ¶¶ 7-13.
[5] *See* Ex. F, Tarry Paystubs, March 28, 2015 (indicating Tarry was paid $3.18 per hour for overtime hours in 2015); Ex. G, Zayneeva Paystubs, June 4, July 16, and July 30, 2016 (indicating that Zayneeva was paid $4.71 for overtime hours in 2016).

worked as an assistant manager, and has himself taken a portion of servers tips and placed them in the restaurant's safe at the end of the night. *Id*. He has also been tipped out from servers tips as an assistant manager. *Id*. He is also aware that, each morning, office manager Jackie takes the servers tips and deposits them in Defendants' bank account. *Id*. In fact, Mr. Tarry's close-out receipt for the entire restaurant from September 5, 2016 shows the Defendants' "house tip out" policy was applied to all sales obtained within the restaurant. *See* Ex. O, Sept. 5, 2016 Restaurant-Wide Close-Out Receipt. On that day, the Myrtle Beach location generated $64,271.98 in sales, service charges, and taxes. *Id*. On the same day, the Myrtle Beach location received $1,763.25 in "house tip out." *Id*. Meanwhile, the servers themselves only took home $1,521.58 in tips. *Id*.

Plaintiffs have exceeded the "low standard of proof" required at this stage. *Curtis*, 2013 WL 1874848, *2. They ask that the Court conditionally certify this case as a collective action.

### 3.3.     Court-authorized notice is appropriate in this case.

In combination with an order conditionally certifying this collective action, Plaintiffs also request that the Court authorize that notice be disseminated to all individuals who worked at Defendants' Captain George's Seafood Restaurant locations as servers since May 31, 2014. Plaintiffs seek permission to send the notice through regular mail in addition to email, text message, and the posting of the notice at all of Defendants' locations. Finally, Plaintiffs seek permission to allow putative Collective members to opt into the case via electronic signature, if they choose. Plaintiffs' proposed notice and opt-in methods are in line with the FLSA's remedial purpose.

### 3.3.1.   Plaintiffs' proposed notices.

Attached as Exhibit P is Plaintiff's proposed Judicial Notice. Plaintiffs' proposed notice has been carefully drafted to achieve "the goals of the notice: to make as many potential plaintiffs as possible aware of this action and their right to opt in without devolving into a fishing expedition or imposing undue burden on the defendants." *Elmajdoub v. MDO Development Corp.*, No. 12-cv-5239, 2013 WL 6620685, at *4 (S.D.N.Y. Dec. 11, 2013) (*citing Guzelgurgenli v. Prime Time Specials, Inc.*, 883 F. Supp. 2d 340, 356 (E.D.N.Y. 2012)).

Once notice is sent, Plaintiffs request that members of the Collective be granted 90 days in which to return an opt-in form. *See Morris,* 2017 WL 698612, *3 (granting plaintiffs' request for a 90 day notice period); *Butler v. Direct SAT USA, LLC*, 876 F.Supp.2d 560, 574-75 (D. Md. 2012) (granting 90 day notice period because "[t]he district court has broad discretion regarding the 'details' of the notice sent to potential opt in plaintiffs.").

Plaintiffs request that the notice be posted at each of the Captain George's restaurants owned and operated by Defendants. Courts in this circuit routinely permit collective action notices to be posted at work locations. *See, e.g., Boyd v. SFS Communications, LLC,* No. 15-cv-3068, 2017 WL 386539, *3 (D. Md. Jan. 26, 2017); *Mendoza v. Mo's Fisherman Exchange, Inc.,* No. 15-cv-1427, 2016 WL 3440007, *21 (D. Md. June 22, 2016); *Randolph v. PowerComm Const., Inc.*, 7 F.Supp.3d 561, 578 (D. Md. Mar. 25, 2014); *Williams v. ezStorage Corp.*, No. 10-cv-3335, 2011 WL 1539941, *5 (D. Md. Apr. 21, 2011). In the present case, posting of notice at Defendants' four restaurants amounts to an efficient and inexpensive way to provide notice to Defendants' current employees. *Compare Wass v. NPC Intern., Inc.*, No. 09-cv-2254, 2011 WL 1118774, *12 (D. Kan. Mar. 28, 2011) (refusing to allow posting of notice because the benefits would not outweigh the burden on defendants, who owned over 1,000 Pizza Hut restaurants across 28 states, "from having to post the notice in so many stores"). Unlike the defendants in

*Wass*, in the present case, Defendants have only four locations, which each employ dozens if not hundreds of servers who are similarly situated to Plaintiffs.

### 3.3.2. Email and text message notice are appropriate.

The Supreme Court has held that "District Courts have discretion, in appropriate cases, to implement 29 U.S.C. § 216(b)…by facilitating notice to potential plaintiffs." *Hoffman-LaRoche Inc. v. Sperling*, 493 U.S. 165, 169 (1989). In an effort to avoid a "multiplicity of suits," district courts are empowered to oversee notice that is "timely, accurate, and informative." *Id*. at 172. Explaining further, district courts are instructed to authorize notice that is "orderly, sensible, and not otherwise contrary to statutory commands." *Id*. at 170. In 1989, when the Supreme Court made this decision, there is little doubt that notice via first class mail was the best way to provide notice in "an efficient and proper way." *Id*. at 171. But the Supreme Court was intentionally vague in defining the form of the notice to be sent: "We confirm the existence of the trial court's discretion, *not the details of its exercise*." *Id*. at 170 (emphasis added).

In 2017, receiving important information electronically is the norm. As one example, when this Court issues an Order on the present motion, counsel for the parties will be notified about it via email, not regular mail. Regular mail may not arrive at its destination because it may be misdelivered, misplaced, taken from shared mailboxes, left unopened (especially when it is sent from an unrecognized source), and/or sent to an inaccurate mailing address. Although regular mail can often go ignored, especially when the recipient does not know to expect an important letter via regular mail, a great many Americans are connected to their smart phones at all hours of the day. For this reason, notice via email and text message for all putative members of the class is entirely appropriate to properly effectuate notice.

"[T]he use of email to notify potential plaintiffs is now the norm." *Morris*, 2017 WL 698612, *3 (quoting *Butler*, 876 F.Supp.2d at 574-75); *see also Lynch*, 2015 WL 5916212, *6 (allowing notice via email); *McCoy*, 2015 WL 6157306, *4 (allowing notice via email). Plaintiffs' proposed email is attached as Exhibit Q.

Plaintiffs also seek to send notice via text message. *See Bhumithanarn v. 22 Noodle Market Corp.*, No. 14 Civ. 2625, 2015 WL 4240985, at *5 (S.D.N.Y. July 13, 2015) ("Given the high turnover characteristic of the restaurant industry … notice via text message is likely to be a viable and efficient means of communicating with many prospective members."); *Vasto v. Credico (USA) LLC*, No. 15-cv-9298, 2016 WL 2658172, *16 (S.D.N.Y. May 5, 2016) ("[C]ourts in this district have permitted email and text message distribution where, as here, the nature of the employer's business facilitated a high turnover rate among employees."); *Eley v. Stadium Group, LLC*, No. 14-cv-1594, 2015 WL 5611331, *3 (D.D.C. Sept. 22, 2015) (granting notice via text message); *Martin v. Sprint/united Management Company*, No. 15-cv-5237, 2016 WL 30334, *19 (S.D.N.Y. Jan. 4, 2016) (granting notice via text message). Mobile phones are by far the most accessible communication tool for many hourly workers. Further, it is widely recognized that many young people do not even use email, but instead rely almost exclusively on other electronic communication tools like text messaging.[6] Plaintiffs request that the following text message notice be approved:

> NOTICE AUTHORIZED BY UNITED STATES DISTRICT COURT: If you have worked as a server at Captain George's Seafood Restaurant at any time since May 31, 2014, you might be entitled to join a lawsuit claiming back pay for minimum wage and overtime compensation. For additional information about the case, including how to join, please review the full court-authorized notice at [website address].

---

[6] For Generation Z, Email has Become a Rite of Passage, (April 11, 2016) *The Wall Street Journal* (attached as Exhibit R).

Email notice and text message notice are appropriate for both current and former employees in the present case. The low cost of electronic notice makes it a practicable supplement to traditional mail notice. Indeed, the low cost of such notice and its ability to reach otherwise unreachable class members make it indispensable in cases like this.

### 3.3.3. Putative Collective members should be permitted to opt in via electronic signature.

For the same reasons that email and text message notice are appropriate and important measures, putative Collective members should be permitted to opt in to the action through electronic signature software. *See, e.g., Dyson v. Stuart Petroleum Testers, Inc.*, 308 F.R.D. 510, 517-18 (W.D. Texas Aug. 27, 2015) (permitting opt in plaintiffs to join action via electronic signature); *White v. Integrated Elec. Tech., Inc.,* Nos. 11-cv-2186, 12-cv-359, 2013 WL 2903070, at *9 (E.D.La. June 13, 2013) (approving request to allow class members to execute electronic consent forms, noting other "courts have also approved the use of online, electronic signature opt-in forms"); *Bland v. Calfrac Well Servs. Corp.,* No. 2:12-cv-1407, 2013 WL 4054594, at *3 (W.D.Pa. Aug. 12, 2013) (approving without discussion use of signature via e-mail); *Jones v. JGC Dallas LLC,* No. 3:11-cv-2743, 2012 WL 6928101, at *4 (N.D.Tex. Nov. 29, 2012), *adopted in* 2013 WL 271665 (N.D.Tex. Jan. 23, 2013) (approving request that class members be given option of executing consent forms online via an electronic signature service); *Kelly v. Bank of America, N.A.,* No. 10-cv-5332, Doc. No. 151 (N.D.Ill. Sept. 23, 2011) (approving electronic signature opt in forms); *Nobles v. State Farm Mut. Auto. Ins. Co.,* No. 10-cv-4175, Doc. No. 128 (W.D.Mo. Aug. 25, 2011) (approving electronic signature opt in forms).

As other courts have noted, "we live in a time when all manner of commercial transactions are routinely cemented by electronic submission." *Mraz v. Aetna Life Ins. Co.,* No.

17

3:12-cv-805, 2014 WL 5018862, at *5 (M.D.Pa. Oct. 7, 2014). Just as we receive important information electronically in 2017, as discussed above, we also make important commitments online without ever signing a paper document. For example, TurboTax and countless other services will allow users to file taxes online. Rocket Mortgage and others will accept home mortgage applications online. Match.com allows users to enter romantic relationships online. None of this was possible in 1989, when the Supreme Court issued its ruling in *Hoffman LaRoche*. Likely for this very reason, the Supreme Court was intentionally vague, and put discretion into the district court's hands to facilitate notice in an "efficient and proper way." *Hoffman LaRoche*, 493 U.S. at 171. Today, it simply makes sense that a putative Collective member who wants to join this case should be permitted to give his consent online.

Plaintiffs' counsel has used software called Adobe Sign to obtain electronic signatures for other matters. Adobe Sign or another similar program will allow Collective members to sign their consent forms electronically by clicking on a link in an encrypted e-mail designed only for that user, which in turn directs the user's web browser to a website where the user can review the document to be signed, click a box indicating he has read and understood the form, and insert his name and address. Permitting electronic signature achieves the remedial purposes of the FLSA. As such, Plaintiffs request permission to allow putative Collective members to opt in via electronic signature.

### 3.4.    Expedited disclosure of names and contact information is appropriate.

In order to provide potential opt-in plaintiffs with notice of the pendency of this lawsuit, Plaintiffs require discovery of the names and contact information for those individuals. *Byard v. Verizon West Virginia, Inc.*, 287 F.R.D. 365, 377 (N.D.W.Va. Oct. 24, 2012) (ordering production of putative class members' names and contact information within ten days of the court's order).

Accordingly, Plaintiffs request that the Court direct Defendants to produce a computer-readable list of the names, last known addresses, telephone numbers, e-mail addresses, dates of employment, and job titles for all persons employed at their Captain George's Seafood Restaurants as servers between May 31, 2014 and the present.

### 4. Conclusion

For the foregoing reasons, Plaintiffs request the Court to (1) conditionally certify a collective action consisting of Defendants' current and former servers, (2) approve the Plaintiffs' proposed notice of the action, (3) order Defendants to provide name and contact information for all potential Collective members, (4) authorize Plaintiffs to send the notices via first class mail, email, and text message, (5) require Defendants to post the notice in their work locations, and (6) authorize putative Collective members to opt in by using an electronic signature.

Respectfully submitted,

/s/ Patrick McLaughlin
Patrick McLaughlin
Wukela Law Firm
403 Second Loop Rd.
PO Box 13057
Florence, SC 29504-3057
843-669-5634 (Phone)
843-669-5150 (Fax)
(Patrick@wukelalaw.com)

Andrew Biller (*pro hace vice filing forthcoming*)
Andrew Kimble (*pro hace vice filing forthcoming*)
Markovits, Stock & DeMarco, LLC
3825 Edwards Road, Suite 650
Cincinnati, OH 45209
513-651-3700 (Phone)
513-665-0219 (Fax)
(abiller@msdlegal.com)
(akimble@msdlegal.com)

*Counsel for Plaintiffs*

**Certificate of Service**

The undersigned hereby certifies that on the 31th day of May 2017, a copy of the foregoing was filed through the Court's ECF system. The foregoing motion will be served on Defendants in accordance with the Federal Rules of Civil Procedure. When Plaintiffs receive confirmation of service of this motion, they will file a Certificate of Service with the Court.

*/s/ Patrick McLaughlin*
Patrick McLaughlin